# WHEELING.

JACKSON v. LAND ASSOCIATION.

Submitted January 29, 1902. Decided June 7, 1902.

1.  DELINQUENT AND FORFEITED LANDS—*Commissioner.*

   A commissioner of delinquent and forfeited lands divides a large tract into lots for sale. At one end of the tract he makes a line from the outside line part of the way through the tract; at the other end he marks a line part of way through the tract. These two lines extended through the tract will not meet and form a continuous line from outside to outside, but are distant from each other. The plat of the commissioner shows a straight

continuous line from outside to outside of the tract. This straight line, conforming to the plat, is the true line. (p. 491).

2. DELINQUENT LAND—*Division Line Continuous*.

A line should not be deflected except in order to conform to the intention of the parties. And, if possible, a line should be construed to mean a continuous line. (p. 491).

3. EXECUTORY CONTRACT—*Enforcement—Purchase-Money*.

The law is different in forcing a purchaser to pay purchase money in case of an executory contract from what it is in the case where a deed conveying legal title has been accepted by the purchaser, with general warranty. (p. 492).

4. PURCHASE MONEY LIEN—*Enforcement—Answer*.

An answer seeking to resist the enforcement of a line for purchase money in a deed of general warranty for land must allege insolvency of the grantor, or a better adverse title, or a suit actually pending or threatened, contesting the title, and in case of a suit only threatened, the answer must state plausible and substantial grounds for such threatened suit, such grounds as ought to cause a reasonable man to fear the loss of his land. (p. 492).

Appeal from Circuit Court, Randolph County.

Suit by Minter J. Jackson against the Welsh Land Association. Decree for plaintiff, and defendant appeals.

*Affirmed.*

U. G. YOUNG and J. C. McWHORTER, for appellant.

STRADER & STRADER, for appellee.

BRANNON, JUDGE:

Minter J. Jackson conveyed a tract of land by the acre as containing one thousand three hundred and seventy-five acres to The Welsh Land Association, a partnership, reserving a lien for a balance of purchase money. Later it was represented to Jackson that upon a survey of the tract it turned out that it contained only one thousand seventy-four acres, and he accepted payment of balance of purchase money on the basis of one thousand and seventy-four acres in the tract, surrendered the purchase money notes and executed a release of the lien as to the one thousand and seventy-four acres. Still, later as the bill states, he learned that in truth there was no such deficiency in quantity, and he brought a suit in equity in the circuit court of Randolph County to recover the purchase money for the alleged

deficiency of land which had been erroneously alleged to exist and the result of the suit was a decree in Jackson's favor for the difference between one thousand and seventy-four and one thousand three hundred and seventy-five acres, and W. R. Thomas and D. S. Thomas, partners in the association, took an appeal.

The court overruled a demurrer to the bill. It was based on the idea that as the bill itself showed a settlement between Jackson and the association, and the surrender of the notes for purchase money and the release of the lien, it presented no case. The bill alleges a mistake of fact arising from misrepresentation, and a court of equity relieves against such mistake. The bill alleges that Jackson believed the representation as to quantity made to him by a surveyor, and knew not to the contrary, and acted upon a mistake of fact. Upon this statement the bill is maintainable. I will add that the bill alleges that Jackson, upon that settlement, expressly reserved right to claim the money for the deficiency should it thereafter be ascertained to be non-existent. This only adds further ground for an appeal to equity.

Under this demurrer it is argued that the court erred in overruling it, because the statute of limitations barred a personal decree; but the bill shows that the last purchase money note had not become barred when the suit was instituted. It is not claimed, and cannot be, that limitation affects the lien. The lien was released only as to the one thousand and seventy-four acres; but if it had been a total release, and made under mistake of fact, and especially with that reservation, equity would relieve against it. There is no error in overruling the demurrer.

The vital question in this case is whether the deficiency exists. This being purely a question of fact, we are not strictly called upon to give any reasons for our conclusion, and certainly not to enter into the details which the great volume of evidence would justify. I might write pages upon the evidence upon dozens of lines and dozens of corner trees of the thirty lots into which the well known Davenport Survey of thirty thousand acres granted June 25, 1794, was divided by Robert Ervin, deputy for Minter Bailey, commissioner of delinquent and forfeited lands of Lewis County in 1839 or 1840, and sold by such lots by decree of the Circuit Superior Court

of Law and Chancery of Lewis County by said commissioner Bailey in the year 1840. Lot No. 30 in the division of said entire tract came to the hands of Jackson, and he sold it to The Welsh Land Association. The controversy rests on the location of the division lines between lots 30 and 19, and for a small quantity on the division line between lots 29 and 30. This involves, more or less, the ascertainment of all the lines and corners of any or all the other lots. The great amount of surveying done in the Davenport Survey presents many questions of complication. I confess that the case has given me great labor and perplexity from the many lines and corner and line trees and numerous surveys by different surveyors.

Let us take up the division line between lots 19 and 30, the important consideration in this case. I have come to the conclusion that the evidence shows by decided preponderance that a Spruce, sometimes called Hemlock, shown on the plat of Marsteller, surveyor of Randolph County, at letter M on his plat is an original corner of lots 19, 20, 29 and 30 in the division of the Davenport Survey made by Ervin preparatory to a sale of the land under said decree as delinquent or forfeited. That large Spruce is plainly marked for such corner, and its annulation counted 56 years, thus suiting the date of the survey made by Ervin. A Spruce is called for at this point by the deeds from Bailey for a corner of lots 19, 29 and 30, though a Red Oak is called for, likely by mistake, for lot 20. All those lots must have the same corner. Marks on that tree stamp it as a tree made by Ervin as a corner. From that tree the divisional line of five hundred and fifty poles between lots 19 and 30 is established by many marked threes corresponding in age with Ervin's survey. A maple and gum are called for at the end of the line running from that spruce between lots 19 and 30 to the outside line of the Davenport Survey, and it is relied upon with confidence by the plaintiff that the absence of these trees will dispute this line; but James Pickens is positive in his statement that he saw these trees marked as a corner, one of them beginning to fall against another tree, and as a road and tram road have been made just there, the road just where these trees stood, this will plausibly account for their disappearance. What right have we to disregard Picken's specific statement. And besides this, though these trees be not found, the spruce being indelibly established, we run the

bearing of Bailey's deed out to the outside line of the Davenport. So if these trees had not been seen, I do not see that the fact would militate with any great force against this line. Mathematics tell us where this corner is. Another line from a blazed red oak is claimed, it seems, by the plaintiff for such corner; but that is not at all established as a corner, the age of its marks being too young according to Pickens, the marks being mere blazes, not corner marks. The evidence does not show that it is a corner tree. From it no line is found marked parallel with that from the spruce to the original outside line of the Davenport, though a line from that red oak would go through timber where we ought to find very plain marks, numerous ones, as we do find on other lines made by Ervin. So, too, a spruce some distance from the blazed red oak is set up as a corner, and the argument made that this division line between lots 19 and 30 should be run from it to the outside line of the Davenport; but no marked line is found from it to the southern line of the Davenport. No line that we can run from the red oak or the second spruce has any support from marked trees at all comparable to the evidence of marked trees on the line from the other spruce. A corner and line could not be better established than that from the spruce at M to the original line of the Davenport. From that spruce north east we find well marked lines for eight hundred poles between lots 20 and 29, 21 and 28, suiting the surveying in age; and we find numerous lines well marked running from other parts of the survey to these lines, identifying and establishing them, if that were needed to aid the evidence found on those lines themselves. Then let us go to another original line of the Davenport to a poplar and birch, a corner called for in Bailey's deeds for lots 29 and 30, a well marked corner, and we find a well marked line suiting exactly the magnetic call of Ervin's divisional survey, passing by the spruce at M, a line upwards of one thousand nine hundred poles in length to the opposite outside line of the original survey, to two chestnut oaks, corner to lots 5 and 6, this line being abundantly established by many corner and line trees, blocked and suiting the division in age, and made with the same hatchet used in marking undisputed corners in Ervin's survey. This long line from the poplar and birch clear through the Davenport Survey fixes that spruce as a corner of lots 19 and 30; and it is confirmed by the lines

already mentioned from a chestnut corner to lots 21, 22, 27, 28 out by the spruce to the Davenport original line at gum and maple called for by Bailey's deed for lot 30 and lot 19. Surveying done in other parts of the old tract, around many of its lots, too tedious to detail here, only confirms this spruce as a corner of lots 19, 20, 29 and 30. The poplar and birch on the original Davenport line are called for by Bailey's deed as a corner for lots 29 and 30, and are well marked, suiting the divisional survey in annulations. There can be no reasonable question that Ervin made that spruce corner at M. True, some 18 poles from the poplar and birch there is a competing corner, a spruce and birch. It is not the corner, as Bailey's deeds call there for a poplar and birch. We find the poplar and birch where they should be, well marked to suit the division in age. Why substitute for that corner a spruce and depart from Bailey's call? And the poplar and birch suit that long line of more than one thousand nine hundred poles across the Davenport, and confirm the spruce at M as a corner—that is the line confirms it. The spruce and birch corner will not suit that long line. It is true that from this corner we do find, for a little distance from the original Davenport line, a line marked, and then apparently without marks for some distance, and then marked again, passing near the blazed red oak, and on to a spruce standing on a cliff, and some trees on this line seem to suit the divisional survey of Ervin; but this line has no such strength as the other line from the poplar and birch passing the spruce at M, and on through the entire tract to the two chestnuts on the original Davenport line, and for these reasons: Its marks give out at about four hundred poles; it is there lost in the wilderness. It should go on many hundreds of poles, about one thousand five hundred further, passing numerous corners of lots. The other line does go on passing numerous corners, all marked suitably for the survey, one the spruce, another a red oak, another a gum and a chestnut oak, another a sugar, and then the two chestnut oaks. Moreover, the magnetic bearing of this line in Bailey's deeds would not follow the line of which I now speak, or actually touch the blazed red oak, and the partly marked line, if extended, would not strike the corner of lots 5 and 6 at the two chestnut oaks on the original line, but would miss it 66 poles. It is not the same bearing as Bailey calls for. I confess this

line perplexed me at first, but not at last, as it does not compare in strength with the line from the poplar and birch. It is hard to account for the presence of this line, and the several accomplished surveyors do not tell us what it is, probably because it would be mere opinion. It seems to me it may have been started in the divisional survey, and then found wrong and abandoned; but whatever may be its explanation, it is not established as a line. To accept it and reject its neighbor line would be an indefensible decision. The truth seems to be that that long neighbor line establishes the poplar and birch corner and the spruce corner, and many other corners found in its course, and those corners establish that line, because line and corners are found where they should be and harmonize. Therefore, it seems to me that the line from the spruce at M out to the maple and gum (maple stump on Marsteller's plat) was actually made by Ervin. It seems also clear to me that the line from the poplar and birch on Marsteller's plat passing the marked spruce at letter M, and on to the outside line of two chestnut oaks, is the true line between lots 29 and 30, 19 and 20. No other explanation of all this work is given. A witness says that a survey called the "Stewart" survey lapped over on the Davenport. We do not know that any such survey exists, as no patent or other evidence of it is in the case. It is said, or proven, that the line from the spruce at M crosses the outer line of the Davenport, and continues beyond it some fifty poles marked, and there stops without any corner mark, and it is argued that the line found on the ground from that spruce belongs to the Stewart survey. We have nothing to confirm this—nothing to tell other lines by, and are not warranted in saying that this marked line belongs to the Stewart survey.

If this were all, the case would end here; but it is by no means all of the case. We must go elsewhere upon the survey. Then, we will go from the southern end of the Davenport to its northern end, to a sugar corner found on Marsteller's plat. It is an established corner in Ervin's divisional survey. Nobody disputes that proposition in this case. We find running from it a line passing a birch and beech on an island in the Buckhannon river, and thence going on to a maple and red oak, and some evidence goes to show that it continues marked to a chestnut. That sugar stands on an

original line of the Davenport. The birch and the beech are abundantly identified, because Ervin's plat shows them just at the river, and they are living and the marks on them suit his survey, and thus this corner is established as both a natural and an artificial call. But nobody questions that birch and beech as a corner of lots 24 and 25, and 23 and 26. Go on to the maple and red oak, corner to 22, 23, 26, 27. There it is marked suitably for Ervin's work, and nobody questions it. So, here is an unquestioned marked line of eight hundred poles, and some evidence goes to show that there is a suitable chestnut corner for lots 22, 27, 21, 28. If so, here we find a marked line of one thousand two hundred poles. But its length makes no difference; for I do not understand anybody to dispute that this line from that sugar, passing the birch and beech at the river, and thence to the maple and red oak, is a veritable Ervin line. Surveys made from the east for other lots are confirmatory of this line. Now, this line stops at the maple and red oak, or say, at the chestnut, and wants marks for one thousand three hundred and fifty or one thousand seven hundred and fifty poles out to the southern line of the Davenport. It is thus unmarked, it must be confessed, for a long distance. This is not a marked line clear to the disputed ground. Perhaps this is not stating this feature of the case with exact accuracy. There is a spruce tree found in an extension of the line from the sugar standing on a cliff on the line running from the spruce and birch, above spoken of, some 8 poles from the blazed red oak, and near the line running across the survey from the poplar and beech, and thus very near lots 30 and 19. It has corner marks on it suiting the age of Ervin's work, and to some extent it supports a line run clear through from the northern end of the Davenport at the sugar to the southern end of the Davenport. Hence it may be claimed that this is a corner of lot 30, and that the division line between lots 19 and 30 must be run from that corner of its own strength, without appealing to the other end of that line; but this argument is weakened by the fact that that spruce stands on the line that I have spoken of running from the other direction, that is, from the spruce and birch out past the blazed red oak. It seems to me that it suits that line; therefore I do not attach much force to that corner because it finds no support from lines north or south from it. I mean

no support from marked trees on lines north and south from that spruce. Still, there the tree is. I should also add that at the end of a line running from that sugar clear through the survey passing the birch and beech at the river we find at the southern line of the Davenport a depression in the ground apparently made from the faling of a tree, and from it was taken a maple root, affording an argument that there stood the maple and gum corner called for in Bailey's deed for lot No. 30. But suppose we throw away all consideration of that depression in the ground, and reject it as the place of an actually identified corner, and reject that spruce as a corner, and also reject the blazed red oak as a corner. Then what? There still remains the fact that from the northern end of the Davenport, starting at the sugar, passing the birch and beech on the island in the Buckhannon river, and going on to the maple and red oak corner, if not to the chestnut corner at lots 21 and 28 on Marsteller's plat, we have an undisputed and indisputable line, made by Ervin's actual work, which line extended to the southern line of the Davenport will pass the spruce on the cliff and about twenty poles from the blazed red oak, and pass to the north of the spruce at M about seventy-five poles, and reach the southern line of the Davenport at the said depression in the ground. And remember that we have also a line running from the southern end of the Davenport at a point marked beech or maple stump on Marsteller's plat, passing the spruce at M on past an ash and sugar to a chestnut, corner to lots 21, 22, 27 and 28, which line is a marked line and is Ervin's work. Thus we have two lines, one running from the northern end of the survey marked only part of the way through it; the other running from the southern end of the survey marked only part of the way through it. If extended they will never meet to form one continuous line, as they should do, because Ervin's plat shows a continuous line from the northern to the southern end of that survey over that ground. These marked lines, however, will not meet, but extended through from outside to outside of the Davenport, will be distant from each other about eighty-two poles, as best I can see from the dim figures on the plat before me. Now, we will have to adopt the one or the other of these two lines. Which one does the law adopt? The sugar is fixed. The birch and beech at the river are a fixed corner; so are the maple

and red oak. There can be no dispute about those corners. So, I think there can be no dispute about corners on the other line. A mistake here comes in in not making those lines form a continuous line. We must say that the line from the sugar on the north end of the survey extended through to the southern end is to be regarded in law as the true line, because it conforms to Ervin's plat, which shows a straight line commencing at that sugar and running through the survey. We choose that line, rather than the other, because it more accords with the distance from the corners and lines of the old survey, being just four hundred poles therefrom, as called for by Bailey's plat and deeds, while it is three hundred and eighteen from the spruce at M, and it harmonizes with the lay of the lots on Ervin's plat. It is true that we generally do allow marked lines to control. That would be the case, if we were finding the lines of only one tract. Under ordinary circumstances the law would say that wherever the commissioner of delinquent and forfeited lands marks lines and corners, and then sells by them, the purchaser gets and takes and holds by those lines and corners, mistake or no mistake; but that will not do in this case, because we would have one line going part of the way, and another going part of the way, and never meeting to form one line, but if extended through the ground to be covered, would make two separate lines, distant from each other, when Ervin intended one unbroken line, as his plat and the commissioner's deeds for the different lots show. We can not go to the end of one of these marked lines and deflect from its straight course and run a line to the end of the other marked line. Such was not Ervin's intention. The law does not allow this, but says that we must make a straight line from out to out of the Davenport tract. "A line should not be deflected except in order to conform with the intentions of the parties. And if possible, a line should be construed to mean a continuous line." 4 Am. & Eng. Enc. L. 807. This case involves principles like those in *Smith v. Davis,* 4 Grat. 50, where commissioners were appointed to divide a tract between two owners, and fixed the corners of the dividing line, and intended that the division should be by a straight line, and the line was so described in their report, and so laid down on their plat; but by mistake the line which they actually marked on the ground was not straight. The court held that the line as

it was intended to be, and not the marked line, was the true division line. Therefore, we hold that the true line running from the sugar on the northern line of the Davenport survey past the birch and beech on the island in the Buckhannon river, on through the Davenport tract to the southern line of that tract, is the line which is to fix the division line between lots 19 and 30. The line here meant is that found on Marsteller's plat running from the sugar corner to lots 24 and 25, by the course S. 35 W. to maple and gum called for. Thus .we find that there is no deficiency in the tract conveyed by Jackson.

When the Welsh Land Association learned that the boundary of its deed from Jackson did not take in several hundred acres of land which it thought it did include, it purchased of Crislip a part of lot 19, so as to take in the land in question, and sets up as a defense against Jackson's claim adverse title to the disputed ground; but as the two lots are coterminous I do not see that the question of limitation arises. Adverse possession is not proven; and if it could be said that there is any evidence of it, there is no proof of its exact limit, and as the title to lot 19 does not include the ground, an enclosure of particular land must be shown. A mass of authority is cited to show that a purchaser will not be compelled to take a doubtful title; but that authority applies to executory contracts, not where a deed has been accepted passing legal title. There a different law applies, as shown in *Spencer* v. *Sandusky,* 46 W. Va. 582, and *Bennett* v. *Pierce,* 45 *Id.* 654. Where a deed has been accepted, the purchaser cannot refuse to pay purchase money, unless his grantor is insolvent, or the title is proven to be bad, or a suit endangering it is actually pending, or threatened, and in the last case the grounds of suit must be given, and they must be such as ought to cause a reasonable man to fear loss of his land. *McClaugherty* v. *Croft,* 43 W. Va. p. 272. The answer must set up some of these facts. The answer in this case does not do so. It simply charges, in the most general way, that the land "is claimed adversely by parties other than parties hereto, viz: D. S. Thomas claiming under Crislip and A. G. Giffin, and plaintiff Jackson can not put defendants in possession thereof, or confer title to the same." This answer is entirely defective under this head. We cannot consider this defense of bad title, even if the evidence sustained it,

because a defense not pleaded cannot be considerd. It is immaterial in any view. As Jackson's deed covers the land in question there is no loss of land, and there can be no claim under lot 19 as it does not cover the dispute, and the tracts being coterminous there could not be adverse title under lot 19. If Jackson's deed did not cover the dispute, then it would be simply a question of loss of land, not of adverse possession.

Decree affirmed.

*Affirmed.*